IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

TRACY R. BOLIN                                                          PLAINTIFF


        v.                          CIVIL NO. 21-3042


KILOLO KIJAKAZI, Acting Commissioner
Social Security Administration                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Tracy R. Bolin, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on June 5, 2018, and April 3, 2020, respectively, alleging an inability to work since April 7, 2016, due to chronic back, neck and arm pain; headaches; anxiety; panic attacks; degenerative disc disease; bulging discs; arthritis; depression; high blood pressure; and sciatica. (Tr. 77, 218). For DIB purposes, Plaintiff maintained insured status through June 30, 2018. (Tr. 229). An administrative telephonic hearing

1

was held on May 8, 2020, at which Plaintiff appeared with counsel and testified. (Tr. 20-49). By written decision dated June 26, 2020, the ALJ found Plaintiff maintained the RFC to perform light work with limitations. (Tr. 118-134).

Plaintiff requested a review of the hearing decision by the Appeals Council, who issued a Notice of Appeals Council Action (Notice) dated January 28, 2021, granting Plaintiff's request for review. (Tr. 213-217). In this Notice, the Appeals Council proposed to issue a decision finding Plaintiff disabled as of June 26, 2020, but not prior to that date, based on his SSI application. The Appeals Council further stated because Plaintiff's insured status expired on June 30, 2018, it intended to deny Plaintiff's request for review of his claim for DIB. Plaintiff submitted additional evidence to the Appeals Council.

By written decision dated April 6, 2021, the Appeals Council adopted the ALJ's findings and conclusions regarding whether Plaintiff was disabled for the period prior to June 26, 2020. The Appeals Council found that Plaintiff met the insured status requirements through June 30, 2018. (Tr. 10). The Appeals Council found Plaintiff had an impairment or combination of impairments that were severe. (*Id.*). Specifically, the Appeals Council found Plaintiff had the following severe impairments: degenerative disc disease/degenerative joint disease of the lumbar spine with spondylosis, degenerative disc disease of the cervical spine with spondylosis, generalized osteoarthritis, mild bilateral carpal tunnel syndrome, hypertension and bradycardia. However, after reviewing all the evidence presented, the Appeals Council determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (*Id.*). The Appeals Council found Plaintiff retained the residual functional capacity (RFC) for:

> [L]ight work except [he] can occasionally climb ramps and stairs but cannot climb ladders, ropes or scaffolds. The claimant can occasionally stoop, kneel, crouch and

crawl and is limited to occasional bilateral overhead reaching, handling and fingering. [He] should avoid concentrated exposure to concentrated vibration.

(*Id.*). The Appeals Council found Plaintiff could not perform his past relevant work because it exceeded his RFC. (*Id.*). The Appeals Council then applied the age categories non-mechanically, noting Plaintiff reached age 55, which was considered advanced age. (*Id.*). The Appeals Council further found:

> For the period before June 26, 2020, if the claimant had the residual functional capacity for the full range of light work, Medical-Vocational Rule 202.14 would direct a finding of not disabled. Although the claimant has nonexertional limitations that affect the ability to perform light work, there are other jobs existing in significant numbers in the national economy [he] can perform based on [his] vocational factors and residual functional capacity including the jobs of usher (Dictionary of Occupational Titles (DOT) 344.677-014 and rental consultant (DOT 295.357-018). Within the framework of the above-cited Rule, the claimant is not disabled.

(Tr. 11). The Appeals Council found as of June 26, 2020, based on a change in age category, Plaintiff was disabled.

Subsequently, Plaintiff filed this action. (ECF No. 2). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (ECF Nos. 15, 17).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.   **Evidence Presented:**

At the time of the telephonic administrative hearing held before the ALJ on May 8, 2020, Plaintiff testified that he was fifty-four years of age and had obtained a high school education. (Tr. 26-27). The record revealed Plaintiff's past relevant work consists of work as a logging tractor operator, a logger, and a log truck driver. (Tr. 44, 243).

Prior to the relevant time period, Plaintiff was treated for various impairments to include but not limited to chronic neck, back and arm pain; muscle pain; hypertension; and hyperlipidemia.

The pertinent medical evidence in this case reflects the following. On April 19, 2016, Plaintiff was seen by Dr. Sandra S. Young for a blood pressure check and lab work. (Tr. 581-584). Dr. Young noted Plaintiff had been on lisinopril since 2013, and since starting this medication his blood pressure had been good. Dr. Young noted Plaintiff's chronic back pain was being treated by Dr. Chatman, who had prescribed hydrocodone and morphine. Plaintiff reported the medication was not effective and that steroid injections had also failed to provide relief. Plaintiff reported his back pain radiated down the back of his right leg. After examining Plaintiff, Dr. Young assessed Plaintiff with hypertension, hyperlipidemia and chronic GERD (gastroesophageal reflux disease) and prescribed medication.

On May 10, 2016, Plaintiff was seen by Dr. Young to discuss his hypertension medication. (Tr. 578-580). Plaintiff reported that the medication made him feel dizzy. After examining Plaintiff, Dr. Young assessed him with hypertension and prescribed a different medication.

On May 31, 2016, Plaintiff was seen by Dr. Ira Chatman for a follow-up for his pain. (Tr. 760-764). Plaintiff reported his pain was basically stable and controlled with the current medications. Plaintiff denied side effects from the medication and indicated he was able to maintain physical activity. Dr. Chatman noted Plaintiff was able to perform activities of daily living with pain medication. Upon examination, Dr. Chatman noted Plaintiff appeared alert and oriented and was in no acute distress. Active range of motion in Plaintiff's cervical spine was limited, and stiff and tender on palpation. Dr. Chatman noted Plaintiff's cervical spine was stable with no palpable trigger points observed. Dr. Chatman observed tenderness at the thoracic paraspinal muscles and fact joint lines. Palpation of the bilateral sacroiliac joint area revealed right and left sided pain. Dr. Chatman noted Plaintiff had a normal mood and affect and intact memory. Plaintiff was able to toe walk and had a normal gait but was unable to heel walk. Plaintiff had

normal strength in both his upper and lower extremities. Plaintiff requested transferring his treatment to a clinic closer to his home. Dr. Chatman noted Plaintiff elected to discontinue interventional therapy and would continue to take pain medication provided by his primary care physician. Dr. Chatman did not prescribe medication and noted Plaintiff would return as needed.

On June 2, 2016, Plaintiff was seen by Dr. Young to re-establish care for his back pain. (Tr. 574-577). Plaintiff reported he had been taking both hydrocodone and morphine, noting that the morphine made him feel sleepy and lazy and did not relieve his pain, so he did not take it regularly. Dr. Young noted Plaintiff was out of both medications. Plaintiff also provided a note from Dr. Chatman stating that Boston Mountain Clinic could refill the prescriptions for both medications and that Plaintiff would return to him if dosage adjustments were required. Plaintiff reported his pain was worse on rainy days. Upon examination, Dr. Young noted Plaintiff was alert and oriented and in no acute distress. A neurological exam revealed Plaintiff had pain in his fingers, bilaterally. Plaintiff was assessed with chronic pain syndrome, hypertension, cervical disc disorder with radiculopathy, intervertebral disc disorder with radiculopathy and endemic generalized osteo-arthrosis. Dr. Young prescribed hydrocodone and morphine. Plaintiff was also given handouts on how to correctly lift and bend. Plaintiff was asked to return for a follow-up in four weeks.

On June 30, 2016, Plaintiff was seen by Dr. Young for a medication refill. (Tr. 571-573). Plaintiff complained of chronic back pain, with his worst pain occurring in the morning. Upon examination, Dr. Young noted Plaintiff was alert and oriented and in no acute distress. A neurological exam revealed Plaintiff had pain down the back of his right leg to the knee. After noting an adjustment with the morphine dosage, Dr. Young refilled Plaintiff's medication.

On July 21, 2016, Plaintiff was seen by Dr. Young for chronic pain with hand swelling. (Tr. 568-570). Plaintiff reported his arms had been aching and swelling, especially when driving.

Plaintiff also complained of chronic lower back pain. Upon examination, Dr Young noted Plaintiff had slight swelling in his fingers. Plaintiff's back was nontender to normal palpation, but tenderness was observed on the left at T7, and on the right at L5. Plaintiff was diagnosed with chronic pain syndrome, intervertebral disc disorder with radiculopathy, and carpal tunnel syndrome, bilaterally. Plaintiff was prescribed hydrocodone and referred to an orthopedic physician to assess the carpal tunnel syndrome.

On July 27, 2016, Plaintiff was seen for bilateral hand pain and numbness. (Tr. 489, 492-493). Plaintiff reported experiencing tingling most of the day that worsened with use. Within two to three minutes of driving, Plaintiff reported he felt tingling. Plaintiff reported having a diminished grip strength. Upon examination, Dr. Linn noted Plaintiff had full range of motion in his wrists, bilaterally. Plaintiff was found to have "a little bit" of decreased grip strength, more on the right; good strength; and numbness in the thumb, second and third fingers, worse on the left. Plaintiff had a positive Phalen's and Durkan compression, bilaterally. Dr. Linn assessed Plaintiff with bilateral carpal tunnel syndrome and recommended splints. Plaintiff was also referred for nerve conduction studies.

On August 4, 2016, Plaintiff presented to Stephen Hearn, APRN, DPT, to undergo EMG (electromyography) studies. (Tr. 494-495). Nurse Hearn noted Plaintiff's complaints of diffuse intermittent bilateral upper extremity pain and digit paresthesias. Plaintiff reported symptom improvement with the use of splints at night. Nurse Hearn found no obvious atrophy or severe weakness. Plaintiff was diagnosed with mild bilateral carpal tunnel with focal motor/sensory demyelination.

On August 25, 2016, Plaintiff was seen by Dr. Young for a medication refill. (Tr. 564-567). Plaintiff reported he was tested for carpal tunnel and was told he had it. Plaintiff also complained

of chronic back pain with radiculopathy. Dr. Young noted Plaintiff had been to pain management and was on oral medication. Upon examination, Dr. Young noted Plaintiff was alert, oriented, and in no acute distress, but appeared to have chronic pain. Plaintiff was diagnosed with intervertebral disc disorders with radiculopathy and chronic pain syndrome. Plaintiff's medication was refilled, and he was referred to pain management. Plaintiff was encouraged to stop smoking.

On October 20, 2016, Plaintiff was seen by Dr. Young for a two-month follow-up and pain medication refill. (Tr. 559-563). Plaintiff complained of left-hand pain, stiffness and swelling for the past week. Dr. Young noted Plaintiff underwent nerve conduction studies and that she had requested the records. Upon examination, Dr. Young noted Plaintiff walked stiffly with his legs slightly straddled and he complained of lower back pain that radiated down both legs. Plaintiff indicated that his left leg and left arm hurt the most. Plaintiff's medications were refilled, and it was recommended that he return for a follow-up in two months.

On December 5, 2016, Plaintiff was seen to discuss his nerve conduction study results. (Tr. 555-558). Dr. Young noted that the findings revealed mild carpal tunnel but were not consistent with cervical neuropathy. Plaintiff reported he continued to wake with a burning sensation in his hands and fingers. Plaintiff also reported that all his joints hurt due to the cold wet weather. Plaintiff was diagnosed with chronic pain syndrome. Dr. Young refilled Plaintiff's medication and referred Plaintiff pain management for care. Plaintiff was to follow-up as needed.

On January 24, 2017, Plaintiff was seen by Dr. Chatman to resume pain management treatment because his primary care physician retired. (Tr. 593-596). Treatment notes indicated Plaintiff was last seen in April 2016. Plaintiff reported that with the use of medication he was able to perform activities of daily living. After examining Plaintiff, Dr. Chatman prescribed medication and recommended Plaintiff undergo lumbar epidural steroid injections.

On January 25, 2017, Plaintiff was seen by Dr. Chatman to undergo a lumbar epidural steroid injection. (Tr. 746-747).

On February 15, 2017, Plaintiff was seen by Dr. Chatman to undergo another lumbar epidural steroid injection. (Tr. 749-750). Plaintiff reported a fifty-percent overall improvement in pain as well as increased functionality for at least two to three weeks after the first injection. Due to the positive response from the first injection, Dr. Chatman recommended and provided Plaintiff a second injection.

On March 17, 2017, Plaintiff was seen by Dr. Chatman for a follow-up regarding his pain. (Tr. 753-756). Plaintiff reported about a ninety-percent reduction in the radicular component of his pain. Due to Plaintiff's report that his pain medication was not effective, Dr. Chatman increased the dosage. Dr. Chatman noted that lab results were inconsistent with Plaintiff's treatment regimen. Plaintiff was told any further evidence of noncompliance would lead to the consideration of discontinuing his treatment at the clinic. Plaintiff reported he was able to perform activities of daily living with the use of mediation. Plaintiff's medication was adjusted and refilled. After discussing options with Plaintiff, Dr. Chatman noted Plaintiff agreed to proceed with a medical branch block.

On April 12, 2017, Plaintiff was seen by Tessa Hilson, APRN, for right hand pain and swelling for the past four days. (Tr. 550-554). Plaintiff denied experiencing numbness, tingling or burning in the hand. Plaintiff reported he came to the clinic from the gun range as he had been unable to use his gun due to pain and swelling. Plaintiff also requested a month supply of an antibiotic to take for his teeth. Upon examination, Nurse Hilson noted Plaintiff was pleasant and in no acute distress. Plaintiff exhibited a normal gait. Nurse Hilson noted Plaintiff had mild erythema and tenderness to the third finger MCP (metacarpophalangeal) joint. Plaintiff was unable to close grip his right hand due to moderate edema and discomfort. Nurse Hilson noted Plaintiff

exhibited intact judgment and insight, good eye contact, normal speech and appropriate mood and affect. Plaintiff was assessed with right hand pain and swelling. Nurse Hilson noted Plaintiff was going to the Harrison hospital for x-rays of the right hand and would take Ibuprofen as well as the Hydrocodone that he had for his hand pain. Plaintiff also reported he had stopped taking the Cymbalta prescribed by Dr. Rubio five days ago with the intention to discontinue use permanently. Nurse Hilson declined to give Plaintiff a month worth of antibiotics. The x-rays of Plaintiff's right hand revealed no acute fracture. (Tr. 513, 588).

On April 18, 2017, Plaintiff was seen by Nurse Hilson for a follow-up for his right hand. (Tr. 547-549). Plaintiff reported he was somewhat better but still uncomfortable. Plaintiff reported he had been given Tramadol for pain in the past and that had worked well for him. Plaintiff denied tingling and numbness in his hands. Upon examination, Nurse Hilson noted Plaintiff had tenderness to the third finger MCP joint with mild limited flexion and extension due to discomfort. Plaintiff also had decreased right hand edema and increased flexibility. Plaintiff exhibited intact judgment and insight, good eye contact, normal speech and appropriate mood and affect Nurse Hilson noted Plaintiff saw a pain management provider and reported injections had helped his back in the past but he did not want to return to the provider because all they wanted to do was give injections. Nurse Hilson told Plaintiff she could help with acute pain situations, but continued treatment for pain would require a pain management provider.

On June 13, 2017, Plaintiff was seen for right hand pain, particularly the middle finger joint, as well as the ulnar aspect of the third finger joint of the palm being swollen and painful. (Tr. 490-491, 591-592). Josh Trinkle, PA-C, noted Plaintiff had been seen in two other physicians' offices and was given an antibiotic and Meloxicam. Plaintiff reported he exercised on a regular basis. Plaintiff indicated he was unable to make a fist with his right hand. Upon examination, Nurse

Trinkle noted that except for his right hand, Plaintiff exhibited good range of motion in his upper and lower extremities. Upon inspection of the right hand, Nurse Trinkle noted limited range of motion that elicited significant pain in the third finger. X-rays of the right hand were normal. Plaintiff was prescribed a Medrol Dosepak. Nurse Trinkle noted Plaintiff might be referred to a rheumatologist for further evaluation and treatment options.

On June 27, 2017, Plaintiff was seen by Nurse Trinkle for a two-week follow-up regarding his right hand, third finger swelling. (Tr. 486-487). Plaintiff reported significant improvement to almost complete resolution of his symptoms with the Medrol Dosepak; however, he reported the symptoms returned after the medication was discontinued. Upon examination, Nurse Trinkle noted Plaintiff was exquisitely tender in the MCP to the dorsum volar aspect and the A1. Plaintiff exhibited limited range of motion regarding the MCP flexion and PIP and DIP flexion secondary to pain and swelling. Nurse Trinkle noted Plaintiff experienced significant improvement in the right hand third finger swelling with the use of a Dosepak which likely meant an underlying rheumatologic disorder. Nurse Trinkle referred Plaintiff to Dr. Rubio for further evaluation.

On August 3, 2017, Plaintiff was seen by Dr. Ronald Rubio due to persistent discomfort to the right middle finger. (Tr. 504-506). Plaintiff reported the hand pain suddenly started three months ago. Treatment notes indicated Plaintiff was treated with a tapering dose of steroids that provided temporary relief.  Plaintiff complained of intermittent sharp pain to the right third MCP joint. Plaintiff denied headaches, muscle weakness, anxiety or depression.  Upon examination, Dr. Rubio noted Plaintiff's motor power was 5/5 in all extremities. Dr. Rubio observed diminished neck extension, positive tenderness to trigger points and a tender right third MCP and PIP joint without swelling. Plaintiff was diagnosed with right hand pain and advised to use Aleve for pain and to return in two weeks.

On August 22, 2017, Plaintiff was seen by Dr. Rubio for a follow-up for his right-hand pain. (Tr. 507-509). Plaintiff reported his pain was a four-to-five out of ten on the pain scale. Plaintiff denied the recurrence of swelling. Dr. Rubio noted Plaintiff had been advised to use Aleve at the last visit and that Plaintiff had not done so. Plaintiff reported fatigue but denied headaches, paresthesias, muscle weakness, anxiety or depression. Upon observation, Dr. Rubio noted he did not see any clinical evidence of underlying crippling arthritis or autoimmune rheumatic disease. Dr. Rubio assessed Plaintiff with pain in the right hand. Dr. Rubio recommended Plaintiff use Aleve and follow-up with his primary care doctor for further management should the pain persist. Plaintiff was to return in three months.

On November 2, 2017, Plaintiff was seen by Nurse Hilson to follow-up for his hypertension and hyperlipidemia. (Tr. 541-546). Plaintiff admitted to not checking his blood pressure at home on a regular basis but admitted "it usually runs a little high." Plaintiff complained of neck and back pain and indicated that he had taken hydrocodone and morphine for this pain in the past and was uncertain if he wanted to take re-start this medication. Plaintiff reported frustration with his past pain management provider and that in 2013 a neurosurgeon told him he was not at the point of needing surgery. Plaintiff reported the pain had not worsened over the past several years, but it did impact his quality of life because he had difficulty performing physically demanding tasks. Upon examination, Nurse Hilson noted Plaintiff's cervical range of motion was normal. Nurse Hilson observed that Plaintiff's vertebrae were straight, but he had mild tenderness to his mid low back but had no SI (sacroiliac) joint tenderness. Plaintiff exhibited a normal affect and made good eye contact. Nurse Hilson encouraged Plaintiff to be as active as possible and to return to a pain management provider to help with his pain. Plaintiff was not receptive to physical therapy but was

open to finding a new pain management provider. It was recommended that Plaintiff return in six months.

On December 4, 2017, Plaintiff did not show up for his appointment with Dr. Rubio. (Tr. 497).

On January 3, 2018, Plaintiff was seen by Dr. Seth Garner to establish care and to discuss conservative management of his chronic pain. (Tr. 736-739). Plaintiff reported he was forced to retire from his job as a logger due to hand, neck and back pain. Plaintiff reported that he did not have headaches but looking up caused severe pain. Plaintiff reported experiencing almost overwhelming back and joint pain when he tried to get out of bed in the morning, and that the swelling in his hands made it difficult to hold a cup of coffee. Plaintiff also reported hearing trouble caused by his past work environment. Upon examination, Dr. Garner noted Plaintiff was very uncomfortable in all positions during the exam. Plaintiff was able to slowly ambulate without assistance. Plaintiff exhibited tenderness and muscle spasm of the cervical, thoracic and lumbar spine. Plaintiff was started on Meloxicam and referred for x-rays of the cervical and thoracic spine. Dr. Garner indicated he also prescribed Hydrocodone to help reduce his pain but noted Plaintiff would be referred to pain management if appropriate.

On January 19, 2018, Plaintiff underwent x-rays of the cervical spine that revealed moderate degenerative/arthritic findings without acute abnormality noted radiographically. (Tr. 518-519). Lumbar spine x-rays revealed mild to moderate osteoarthritis and degenerative disc disease without acute abnormality and moderate constipation.

On January 24, 2018, Plaintiff was seen by Dr. Garner for a follow-up for his neck and back pain. (Tr. 732-735). Plaintiff also reported stiffness in his hands, bilaterally. Plaintiff

indicated his symptoms were improved with taking pain medications and resting and exacerbated by basic activities of daily living. Plaintiff denied side effects from his medications. Plaintiff denied trouble hearing, dizziness or balance problems. Upon examination, Dr. Garner noted Plaintiff's pain with palpation of the cervical suboccipitals and lumbar paraspinal musculature, as well as moderate to severe muscle spasm. Plaintiff had normal upper and lower extremity sensation and muscle strength, bilaterally.  Plaintiff underwent mechanical traction, hydrotherapy and manual therapies. Plaintiff's prescriptions were refilled, and Plaintiff was asked to return in one month.

On February 14, 2018, Plaintiff was seen by Dr. Garner for his persistent neck and low back pain. (Tr. 729-731). Plaintiff reported his neck pain was worse lately and rated it a seven out of ten on the pain scale. Dr. Garner noted Plaintiff's symptoms improved with medication and rest and were exacerbated by basic living activities. Plaintiff reported that he was tolerating his medication regimen well and denied adverse side effects. Upon examination, Dr. Garner noted Plaintiff was pleasant and in no acute distress. Plaintiff's vision and hearing were noted a grossly normal. No edema was observed in Plaintiff's extremities. Dr. Garner observed pain to palpation and muscle spasm in Plaintiff cervical and lumbar spine. Plaintiff had normal upper and lower extremity sensation and muscle strength, bilaterally. Dr. Garner opined Plaintiff needed to start another Medrol Dosepak and should stop all strenuous activity to help with his inflammation. Plaintiff underwent hydrotherapy and manual therapies. Plaintiff's prescriptions were refilled, and Plaintiff was asked to return in three weeks.

On February 28, 2018, Plaintiff was seen by Dr. Garner for back and neck pain. (Tr. 726-728). Plaintiff reported the pain caused him to stop work as a logger.  Plaintiff rated his pain as a four out of ten on the pain scale. Plaintiff reported his pain increased with routine activity. Upon

13

examination, Dr. Garner noted Plaintiff was able to ambulate without assistance. Dr. Garner observed Plaintiff had fifty percent range of motion restriction of his spine in all planes, severe spasm in the lower lumbar paraspinal musculature, and positive straight leg raises, bilaterally. Dr. Garner noted a normal sensory exam and normal and symmetric strength. Dr. Garner administered a lumbar trigger point injection and recommended continued use of the back brace. Dr. Garner also recommended the use of a cane to help with balance. Plaintiff underwent hydrotherapy and manual therapies. Plaintiff's prescriptions were refilled, and Plaintiff was asked to return in three weeks.

On March 28, 2018, Plaintiff was seen by Dr. Garner for neck and acute low back pain that radiated down his left leg. (Tr. 722-725). Plaintiff reported after the trigger point injections at the last visit he felt better for about two days before the pain began to return. Dr. Garner noted Plaintiff had been icing and taking medication as prescribed. Plaintiff reported the medication allowed him to perform activities of daily living and some other activity without pain restriction. Plaintiff reported that it took about an hour for his medication to work. Plaintiff denied headaches but reported looking up caused severe pain. Dr. Garner noted Plaintiff's neck and back pain forced him to retire from logging. Plaintiff explained that the pain in his back and joints was almost overwhelming in the morning. With therapy and medication, Plaintiff experienced a reduction in pain, but it was always present. Upon examination, Dr. Garner observed Plaintiff's cervical range of motion was restricted by sixty percent and he had pain when he looked up. Upon light palpation, Dr. Garner noted severe paraspinal muscle spasm. Upper extremity strength was normal, but Plaintiff had decreased sensation in his upper extremities. Plaintiff was able to ambulate without assistance slowly. Dr. Garner opined Plaintiff was making slow progress and thought a MRI of the

lumbar was indicated. Dr. Garner opined Plaintiff could perform activity as tolerated but restricted him from work. Plaintiff was prescribed medication and asked to return in one month.

On April 9, 2018, Plaintiff was seen by Nurse Hilson for a medication refill. (Tr. 538-540). Plaintiff requested a prescription for cream/shampoo for dry skin and scalp. Plaintiff also indicated he wanted to have two broken front teeth repaired but stated he did not have insurance. Plaintiff reported the broken teeth made it painful to eat hard foods. Plaintiff denied feeling down, depressed or hopeless. Upon examination, Nurse Hilson noted Plaintiff had a pleasant appearance, two broken incisor teeth, a normal affect, and good eye contact. Nurse Hilson asked Plaintiff to keep a blood pressure log. Plaintiff was prescribed a medicated shampoo/cream for eczema and his hypertension medication was refilled. Nurse Hilson also indicated Plaintiff needed dental care. Plaintiff was asked to return in five weeks.

On April 24, 2018, Plaintiff underwent a MRI of the lumbar spine that revealed narrowing of the left neuroforamen at L4-L5. (Tr. 520-522).

On May 2, 2018, Plaintiff was seen by Dr. Garner for his low back pain that radiated down his left leg, and neck pain that radiated between his shoulder blades. (Tr. 718-721). Plaintiff reported he had to wait about an hour to an hour and a half after taking his pain medication before he was able to get out of bed. Dr. Garner noted Plaintiff was able to ambulate without assistance slowly. Plaintiff's gait was slow and guarded, but not antalgic. Upon palpation, Dr. Garner noted Plaintiff had moderate spasm in the lower lumbar paraspinal musculature. Plaintiff also reported pain to palpation. Dr. Garner noted Plaintiff was progressing as expected. Dr. Garner encouraged Plaintiff to walk but limited activity to tolerance level. Dr. Garner administered a lumbar trigger point injection and added Lyrica to Plaintiff's medication regimen. Plaintiff was asked to return in one month.

15

On May 14, 2018, Plaintiff was seen by Nurse Hilson for bloodwork and a blood pressure check. (Tr. 534-537). Nurse Hilson noted Plaintiff's blood pressure log showed Plaintiff continued to have mildly elevated readings. Plaintiff denied feeling dizzy or lightheaded. Nurse Hilson noted Plaintiff would be seeing Dr. Jennings to discuss his patient health questionnaire score. Upon examination, Nurse Hilson noted Plaintiff exhibited normal range of motion in his extremities and had a normal affect and good eye contact. Nurse Hilson assessed Plaintiff with hypertension, other and unspecified hyperlipidemia, other abnormal glucose and bradycardia. Nurse Hilson switched Plaintiff's hypertension medication and asked if she could assist with Plaintiff's depression/anxiety. Plaintiff responded that he would wait to see Dr. Jennings.

On May 15, 2018, Plaintiff was seen by Dr. Larry B. Jennings for his depression and anxiety for the last two years. (Tr. 529-533). Plaintiff reported a lot of things had happened in his life and he was now seeking help. Plaintiff attributed his sleep problems to racing thoughts. Plaintiff denied joint pain, muscle weakness or body aches. Dr. Jennings noted Plaintiff was not taking medication for anxiety or depression but was taking Hydrocodone for back pain. Upon examination, Dr. Jennings noted Plaintiff looked well, comfortable and non-ill appearing. Plaintiff made good eye contact and exhibited an appropriate mood and affect. Dr. Jennings found no clubbing or edema in Plaintiff's extremities and indicated negative findings with respect to Plaintiff joints. Dr. Jennings started Plaintiff on Zoloft for his depression and referred him to a health coach. Dr. Jennings recommended Plaintiff get enough sleep, follow a healthy diet and exercise regularly. Plaintiff was to follow-up as needed.

On June 1, 2018, Plaintiff was seen by Dr. Garner for a tension headache; pain; numbness, tingling and weakness in his hands, bilaterally; and low back pain radiating down his left leg. (Tr. 714-717). Plaintiff denied experiencing side effects caused by his medication. Plaintiff's gait was

slow and guarded, but not antalgic. Dr. Garner noted Plaintiff was not using the recommended cane. Upon palpation, Dr. Garner noted Plaintiff had moderate to severe muscle spasm in scalenes and suboccipital muscles, bilaterally; and spasm in the lower lumbar paraspinal musculature. Plaintiff also reported pain to palpation. Dr. Garner encouraged Plaintiff to use a back brace when he was out of bed. A cane was also recommended for stabilization. Plaintiff was encouraged to walk but limit activity to tolerance level. Plaintiff was asked to return in one month.

On June 8, 2018, Plaintiff underwent an audiogram. (Tr. 775). It was recommended that Plaintiff undergo a new hearing aid trial.

The Court reviewed the medical records beyond June 8, 2018, but they are neither relevant nor instructive for the Court's review of the Appeals Council's determination of Plaintiff's capabilities prior to the expiration of his insured status on June 30, 2018.

## III.   Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits *de novo* to ensure that there was no legal error that the findings of fact are supported by substantial evidence on the record as a whole." *Brown v. Colvin,* 825 F. 3d 936, 939 (8th Cir. 2016). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). The Court must affirm the ALJ's decision if the record contains substantial evidence to support it. *Lawson v. Colvin*, 807 F.3d 962, 964 (8th Cir. 2015).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental impairment that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

**IV.   Discussion:**

Plaintiff filed this case primarily appealing the unfavorable portion of the Appeals Council decision denying his Title II claim and argues the following issues on appeal: 1) The ALJ erred in

failing to develop the record fully and fairly; 2) The ALJ erred at Step Two in his severity analysis; and 3) The ALJ erred in determining Plaintiff's RFC. (ECF No. 15). Defendant argues the Appeals Council properly considered all the evidence and the decision is supported by substantial evidence. (ECF No. 17).

### A.    Insured Status and Relevant Time Periods:

To have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on June 30, 2018.   Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of April 7, 2016, his alleged onset date of disability, through June 30, 2018, the last date he was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB, he must prove that on or before the expiration of his insured status he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984) (explaining claimant has the burden of establishing the existence of a disability on or before the expiration of her insured status). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time she last met insured status requirements); *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (explaining the ALJ need "only consider the applicant's medical condition as of his or her date last insured").

With respect to Plaintiff's SSI application, benefits are not payable prior to the date of application, regardless of how far back disability may, in fact, be alleged or found to extend. *See*

20 C.F.R. § 416.335.   Therefore, the relevant period is from April 3, 2020, the date Plaintiff protectively applied for SSI benefits, through June 26, 2020, the date of the ALJ's decision.

      **B.**      **Full and Fair Development of the Record**:

      Plaintiff argues the ALJ erred in failing to order both physical and mental consultative examinations of Plaintiff prior to determining his applications for benefits.

      The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

      As previously addressed the period at issue is April 7, 2016, through Plaintiff's date last insured, June 30, 2018. In this case, the record for the relevant time period includes the assessments of the non-examining medical consultants all dated in 2019, and Plaintiff's medical records. After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities prior to his date last insured. *See Haley v. Massanari,* 258 F.3d 742, 749–50 (8th Cir. 2001) (it is permissible for ALJ to issue decision without obtaining added medical evidence, so long as other evidence provides sufficient basis for ALJ's decision).

**C.      Severe Impairments**:

Plaintiff argues the ALJ erred in finding Plaintiff did not have severe mental or hearing impairments during the time period in question.

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. *See* 20 C.F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. *See* Social Security Ruling 96-3p. The claimant has the burden of proof of showing he suffers from a medically severe impairment at Step Two. *See Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).

With respect to Plaintiff's alleged mental impairments, a review of the evidence reveals that prior to June 30, 2018, Plaintiff was consistently found to be pleasant, to have a normal mood and affect, to make good eye contact, and to have normal judgement and memory. Prior to June 30, 2018, Plaintiff did intermittently report feeling anxious or depressed. On May 15, 2018, Plaintiff was seen by Dr. Jennings for his depression. At that time, Dr. Jennings noted Plaintiff looked well, comfortable and non-ill appearing. Examination notes indicated Plaintiff made good eye contact and exhibited an appropriate mood and affect. Dr. Jennings assessed Plaintiff with unspecified depression, prescribed medication and referred a health coach. The Court notes in November of 2018, well after the date last insured, Plaintiff denied feeling depressed or anxious. (Tr. 799). The Court finds substantial evidence to support the Appeals Council's determination that Plaintiff did not have a severe mental impairment prior to his date last insured.

With respect to hearing problems, the record revealed Plaintiff had used hearing aids in the past. However, Plaintiff's medical providers repeatedly noted Plaintiff had normal hearing throughout the time period at issue. The Court finds substantial evidence to support the Appeals Council's determination that Plaintiff did not have a severe hearing impairment prior to his date last insured.

###    D.    The RFC determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

In the present case, the Appeals Council adopted the RFC findings made by the ALJ for the period prior to June 26, 2020. In determining Plaintiff's RFC, the ALJ considered the medical assessments of the non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform light work with limitations. Plaintiff's capacity to perform light work is also supported by the fact that the medical evidence

does not indicate that Plaintiff's examining physicians placed restrictions on his activities that would preclude performing the RFC determined as of his date last insured. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability). The ALJ also took Plaintiff's obesity into account when determining that Plaintiff could perform light work. *Heino v. Astrue*, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal). While Plaintiff disagrees with the Appeals Council's RFC determination, after reviewing the record as a whole, the Court finds Plaintiff failed to meet his burden of showing a more restrictive RFC. *See Perks v. Astrue*, 687 F. 3d 1086, 1092 (8th Cir. 2012) (burden of persuasion to demonstrate RFC and prove disability remains on claimant). Accordingly, the Court finds there is substantial evidence of record to support the Appeals Council's RFC findings for the time period in question.

     **E.    Hypothetical Question to the Vocational Expert:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true, and which were supported by the record as a whole. *Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the Appeals Council's conclusion that before June 26, 2020, Plaintiff's impairments did not preclude him from performing work as an usher or a rental consultant. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

V.      **Conclusion:**

Based on the foregoing, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of July 2022.


/s/      *Christy Comstock*

HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE